**BINGHAM MCCUTCHEN LLP**

Sabin Willett
Andrew C. Phelan
Evan J. Benanti
Eric A. Heining
One Federal Street
Boston, Massachusetts 02110
Telephone: 617.951.8000

*Counsel for State Street Bank and Trust Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS, INC., *et al.*,<br>               Debtor.<br>_____ | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN COMMERCIAL PAPER INC.,<br>               Debtor.<br>_____ | Chapter 11 Case No.<br>08-13900 (JMP) |
| STATE STREET BANK AND TRUST COMPANY,<br>               Plaintiff,<br><br>         v.<br><br>LEHMAN COMMERCIAL PAPER INC.,<br><br>               Defendant. | Adv. Proc. No. 08-_____ |

<u>**ADVERSARY COMPLAINT**</u>

      Plaintiff, State Street Bank and Trust Company ("<u>State Street</u>"), for its complaint against

defendant Lehman Commercial Paper, Inc. ("<u>LCPI</u>") alleges as follows:

## I. THE PARTIES

1.      Plaintiff State Street Bank and Trust Company is a Massachusetts trust company and a wholly owned subsidiary of State Street Corporation with its principal place of business at 1 Lincoln Street, Boston, Massachusetts 02111.

2.      Defendant LCPI is a New York corporation with its principal place of business in New York, New York.  On October 5, 2008 LCPI commenced in this Court a voluntary chapter 11 case under the Bankruptcy Code, and since that date has operated its business and managed its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## II. JURISDICTION AND VENUE

3.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §157 and §1334(b).

4.      This is a core proceeding under 28 U.S.C. §157(b).

5.      Venue is proper under 28 U.S.C. §1409.

## III. FACTUAL ALLEGATIONS

### A. The Relevant Contracts and Principal Terms

6.      State Street and LCPI entered into a Master Repurchase Agreement dated May 1, 2007 (as amended and with all annexes, the "MRA," a true copy of which is attached as Exhibit 1).

7.      The MRA is a "securities contract" as defined in section 741(7)(A) of the Bankruptcy Code.  State Street is a "financial institution" and "financial participant" as each term is defined in, respectively, §101(22) and §101(22A) of the Bankruptcy Code.

8.      The MRA applies to "Transactions," as defined by the MRA, between LCPI, as "Seller," and State Street, as "Buyer."  The MRA established a repurchase arrangement, whereby

LCPI, by means of a subsequent writing defined in the MRA as a "Confirmation," could sell certain assets to State Street at an agreed "Purchase Price" with a simultaneous agreement to repurchase the assets at a later date (the "Repurchase Date") at an agreed "Repurchase Price."

9.      Section 5 of Annex I to the MRA states that repo Transactions under the MRA could involve certain "Assets," which were defined to include, among other things, commercial loans and their attendant servicing rights, as well as other assets agreed to from time to time by the Buyer and Seller.  The MRA originally referred to the loans purchased in Transactions under the MRA as "Purchased Securities".  An amendment in Annex I to the MRA, however, changed this term to "Purchased Assets".  In this filing, the commercial loans and attendant servicing rights at issue are referred to as the "Purchased Assets."

10.      By means of a July 2007 confirmation letter (the "Confirmation Letter," a true and accurate copy of which is attached hereto as Exhibit 4), the parties entered into a single Transaction under the MRA in which State Street purchased from LCPI a pool of Purchased Assets (i.e., commercial loans and attendant servicing rights) (the "Pool") for a Purchase Price of $1 billion.   At this point, State Street became the owner in fee simple absolute of the Loans subject only to certain repurchase, income, and substitution rights as provided in the MRA.

11.      Simultaneously with its sale of the Purchased Assets to State Street, LCPI agreed to repurchase those assets at an agreed "Repurchase Price" on an agreed "Repurchase Date."  The Repurchase Date is accelerated to become immediate upon default by LCPI.  The Repurchase Price was defined in the Confirmation letter as the $1 billion Purchase Price "plus any accrued and outstanding Price Differential then outstanding."

12.      As is alleged in greater detail below, the parties also agreed to certain terms governing the substitution of Loans in the Pool with other loans from time to time.

13. To facilitate these arrangements under the MRA, State Street, LCPI, and The Bank of New York (the "Bank") entered into a Tri-Party Custody Agreement dated May 1, 2007 (the "Custody Agreement," a true and accurate copy of which is attached hereto as Exhibit 3).

14. Pursuant to the Custody Agreement, the Bank, as the "Master Custodian," served as agent and bailee of, and performed certain services for, both Buyer (State Street) and Seller (LCPI). The Bank held the Purchased Assets in the Pool, as evidenced by "Trust Receipts," in a "Buyer's Master Custodial Account," while the original promissory notes for those Purchased Assets were held by one or more Sub-Custodians under the terms of certain Tri-Party Sub-Custodian Agreements.

15. Under the terms of the MRA and the Confirmation Letter, LCPI was required to ensure that the actual market value of the Purchased Assets in the Pool remained at a designated level above the $1 billion purchase price.

16. Pursuant to the Custody Agreement, the Bank transmitted to State Street daily reports titled, "The Bank of New York TRI-PARTY Investor Allocation Detail Reports" (the "Detail Reports"). Because State Street's Purchased Assets were held in four separate accounts, State Street received four daily Detail Reports (one for each account), that, in the aggregate, reflected State Street's $1 billion purchase.

17. The Detail Reports identified the specific commercial loans that had been purchased by State Street and were in State Street's Pool of Purchased Assets. The Detail Reports contained a column headed, "Market Value." The "Market Value" figure ascribed on the Detail Reports did not, however, reflect the market value of the loan. It simply identified the outstanding principal balance on each commercial loan, rather than any valuation thereof. The Market Value figures were provided by LCPI to the Bank, which the Bank recorded in the Detail Reports.

18.    Under section 5 of the MRA, LCPI received the "Income" from the Purchased Assets, defined in section 2(f) as all interest, principal, and other payments received under the Purchased Assets.

19.    Pursuant to sections 2(k) and 2(l) of the MRA and sections 11 and 12 of the Confirmation Letter,  in lieu of receiving interest and principal on the Purchased Assets in the Pool, pending the repurchase of the Purchased Assets by LCPI, State Street agreed to accept a "Price Differential" from LCPI, which was a fixed amount calculated by applying the 1-month LIBOR rate plus 13 basis points to State Street's $1 billion purchase amount.

20.    Pending its Repurchase of the Purchased Assets, LCPI or a related Lehman entity contracted with TriMont Real Estate Advisors ("TriMont") to service most, but not all, of the Purchase Assets.  State Street was not a party to this servicing contract with TriMont when executed, nor of any servicing contracts with other servicers.

21.    LCPI was obligated to exercise its repurchase rights on the Repurchase Date or, pursuant to section 11 of the MRA, immediately upon notice of an Event of Default from State Street, by paying the Repurchase Price.  Upon LCPI's failure immediately upon default to pay State Street the Repurchase Price, LCPI lost its repurchase rights and State Street immediately became entitled to all Income under and could sell the Purchased Assets to a third party without prior notice to LCPI.

22.    Under section 4 of the Custody Agreement, the Bank was required to segregate and separately account for the Purchased Assets by holding and maintaining them, in the form of Trust Receipts as defined, in State Street's "Buyer's Master Custodial Account."  Under sections 2 and 17 of the Custody Agreement, State Street owned the Purchased Assets held in the Buyer's Master Custodial Account.

23.     Between July, 2007 and September, 2008, LCPI and State Street operated pursuant to the terms of the MRA, the Confirmation Letter, and the Custody Agreement.

**B.      LCPI's Defaults**

24.     Between September 10 and 16, 2008 LCPI committed numerous breaches of the MRA by failing to make required daily Price Differential payments.  Specifically, LCPI failed to make Price Differential payments due in each of State Street's four MRA accounts on September 10, 11, 12, 13, 14, 15, and 16, in a total amount that exceeded $520,000.

25.     Section 11 of the MRA, and as amended by Annex I, defines certain events as "Events of Default," including where LCPI admits its inability to, or intention not to, perform its obligations under the MRA and where LCPI fails to perform any material obligation or covenant under the MRA.

26.     LCPI's failure to make the Price Differential payments in any of the four accounts from September 10 through 16 constituted, individually and in the aggregate, Events of Default under the MRA.

27.     Upon the occurrence of an Event of Default, section 11(a) allowed State Street to "declare an Event of Default to have occurred".

28.     On September 17, 2008 State Street exercised its right to declare an Event of Default and delivered to LCPI the "Default Notice Letter," a true copy of which is attached as Exhibit 8.

29.     On September 17, 2008, State Street sent a letter notifying the Bank of LCPI's default, a true copy of which is attached as Exhibit 9.

30.     LCPI has not contested the validity of the Default Notice Letter or the events of default identified therein.

A/72751832.2

31.     Under section 11(b) of the MRA, State Street's exercise of its right to declare a default had the following effects:

> (i) LCPI's obligation to repurchase all Purchased Assets at the Repurchase Price became immediately due and payable;
>
> (ii) all Income paid after State Street's exercise of its right to declare a default belonged to State Street to apply to the aggregate unpaid Repurchase Price and any other amount owed to State Street by LCPI under the MRA; and
>
> (iii) LCPI was required to "immediately" deliver to State Street any Purchased Assets in LCPI's possession or control.

32.     At the time that State Street declared LCPI's default on September 17, the Pool of Purchased Assets that belonged to State Street consisted of 37 commercial loans. Thirty-six (36) of these were identified in the last set of four Detail Reports that State Street had received on September 16, 2008. True and correct copies of these Detail Reports are attached as <u>Exhibit 7</u> (the "<u>September 16 Detail Reports</u>"). LCPI had surreptitiously and unlawfully purported to remove the 37th loan, the so-called "340 Madison Ave. Mezz" loan (the "<u>340 Madison Loan</u>") from the Pool on September 16, 2008.

33.     LCPI did not repurchase any of these Purchased Assets. Accordingly, all of its rights of repurchase, and any and all other rights with respect to the Purchased Assets were irrevocably cut off.

34.     On September 29, 2008 Melissa Sullivan, Vice President of Lehman Brothers Global Real Estate Group, sent to Q. Sophie Yang, a Senior Portfolio Manager at State Street, a spreadsheet that identified all 37 commercial loans -- *i.e.*, including 340 Madison -- that constituted the Purchased Assets owned outright by State Street. A true and correct copy of that schedule and transmittal e-mail are attached as <u>Exhibit 11</u> (the "<u>September 29 Schedule</u>"). The

September 29 Schedule contains more information about the commercial loans than is contained in the September 16 Detail Reports.

35.     LCPI thereafter contested State Street's ownership of the 340 Madison Loan.

36.     On or about September 19, 2008 State Street took possession of the original notes for the 36 commercial loans listed in the September 16 Detail Reports and the September 29 Schedule, which notes had been held by Sub-Custodian LaSalle Bank National Association.

37.     On September 25, 2008 State Street delivered to TriMont and LCPI a letter that notified TriMont of LCPI's default (the "September 25 Letter," a true and correct copy of which is attached hereto as Exhibit 10).  The September 25 Letter notified TriMont that State Street owned the Pool of Purchased Assets and instructed TriMont to:  "(i) hold all files and documents in custody for the exclusive benefit of State Street and subject solely to the instructions and directions of State Street; [and] (ii) not follow or take action pursuant to the instructions or directions of Lehman or any other person except State Street and promptly forward any instructions or directions from Lehman or any other person to State Street . . . ."

38.     In September 2008, State Street contacted TriMont to discuss the instructions in the September 25 Letter and to explore the possibility of State Street's engaging TriMont to service the Purchased Assets on behalf of State Street.

39.     Subsequent to those discussions, and on information and belief, LCPI and/or another Lehman entity or agent instructed TriMont not to remit Income from the Purchased Assets to State Street, not to communicate with State Street, and not to provide State Street with access to or information in TriMont's servicing files regarding the Purchased Assets.

40.     For example, on October 3, 2008, State Street received a letter from Greg Winchester, Chief Executive Officer of TriMont, that stated that "TriMont is receiving conflicting

instructions with respect to the MRA and issues appear to exist regarding the ownership of the assets which are the subject of the MRA. TriMont is therefore segregating and holding receipts on these assets pending clarification of the existing issues and receipt of consistent instructions from the parties." A true copy of this October 3 letter is attached as <u>Exhibit 12</u>, and indicates that copies were sent to LCPI representatives.

41. In a letter dated October 3, 2008, from Tiziana E.A. Polizio, Senior Vice President and Senior Managing Counsel at State Street, to Greg Winchester at TriMont, State Street asked TriMont to produce a number of items, including: copies of all servicing agreements for all assets under the MRA between TriMont and Lehman (or any entity acting on Lehman's behalf); copies of all files concerning assets under the MRA in TriMont's possession, custody, and control; and schedules showing all past and future payments due under the MRA assets. A true copy of that October 3 letter is attached as <u>Exhibit 14</u>.

42. On October 6, 2008, Craig V. Starble, Executive Vice President at State Street, wrote a letter to Robert Guglielmo, Tom Luglio and others at LCPI, a true copy of which is attached as <u>Exhibit 16</u>. This letter notified LCPI of the October 3 letter State Street had received from TriMont and requested, among other things: (1) all instructions (and the grounds therefore) that any Lehman entity or agent had given to TriMont regarding the Purchased Assets that caused TriMont not to follow the instructions in State Street's September 25 letter to TriMont; and (2) whether it was the position of any Lehman entity that its consent was required in order for State Street to get access to the asset files held by TriMont. In this letter, State Street also asked LCPI for a copy of any servicing agreement under which TriMont was providing services to Lehman regarding State Street's Purchased Assets.

43. LCPI never responded to Mr. Starble's letter.

**C.    LCPI's Inconsistencies:  LCPI First Admits State Street's Ownership But
        Then  Acts To Frustrate State Street's Exercise of Ownership Rights**

44.    On October 10, 2008, Jeffrey Fitts of Alvarez & Marsal as well as outside counsel Michael Bond of Weil Gotsal & Manges LLP spoke by telephone with State Street representatives Paul J. Selian (Chief Investment Officer), Sophie Yang (Senior Portfolio Manager), in-house counsel Tiziana Polizio and outside counsel Sula Fiszman and Sabin Willett of Bingham McCutchen ("the October 10 Call").

45.    Mr. Bryan P. Marsal had previously been retained by Lehman as its Chief Restructuring Officer, and the firm of Alvarez & Marsal had been retained by the debtors, including LCPI, as their financial advisor.  Representatives of Alvarez & Marsal, including Mr. Fitts, are authorized agents of LCPI.

46.    During the October 10 Call, Mr. Fitts acknowledged that: (1) State Street owned the Purchased Assets listed on the September 16 Detail Reports; (2) that State Street was entitled to the Income from those loans; and (3) that LCPI was prepared to share all non-proprietary information relating to the Purchased Assets with State Street, including rent rolls.  During that call, State Street agreed to send a specific list of requests for documents and information to LCPI and TriMont.

47.    On October 10, Mr. Selian, for State Street, sent a confirming e-mail message to Mr. Fitts of Alvarez & Marsal for LCPI confirming what State Street believed LCPI had agreed to in the October 10 Call, including items (1), (2), and (3), in the preceding paragraph.  That e-mail attached the four September 16 Detail Reports that identified the Purchased Assets in State Street's Pool as of the date State Street delivered its September 17 Default Notice Letter to LCPI.  A true and correct copy of that e-mail is attached as Exhibit 17.

A/72751832.2

48.     LCPI did not respond to Mr. Selian's e-mail or reply to it with any indication that LCPI disagreed with its contents.

49.     On October 10, 2008, Ms. Polizio for State Street sent a letter to Greg Winchester at TriMont, stating what State Street believed LCPI had agreed to on the October 10 Call: that LCPI had confirmed with State Street in the October 10 Call that: (1) State Street owned the Purchased Assets listed in the September 16 Detail Reports; (2) State Street owned the Income from those Purchased Assets since September 17, 2008; and (3) State Street had a right to access the non-proprietary information regarding the Purchased Assets. At the same time it sent this letter to TriMont, State Street sent copies of this letter to numerous LCPI representatives, including: Robert Guglielmo and Tom Luglio at Lehman, Robert Feldman and Michael Bond of Weil Gotshal, and Jeffrey Fitts and Gerald Pietroforte of Alvarez and Marsal. A true and correct copy of this letter is attached as Exhibit 18.

50.     State Street never received any communication from LCPI disputing the contents of its October 10 letter to TriMont.

51.     In an e-mail from Sula Fiszman, Esq., of Bingham McCutchen (counsel for State Street), to Michael Bond, Esq., of Weil Gotshal (counsel for LCPI), Ms. Fiszman asked whether LCPI had delivered to TriMont the "schedule of assets acquired by State Street" under the MRA, to which Mr. Bond replied that he thought so, but would check and confirm. A true and correct copy of that e-mail chain is attached as Exhibit 19.

52.     In an e-mail dated October 16, 2008, Mr. Bond sent Ms. Fiszman an e-mail stating, "Attached is the collateral list that you requested." A true and correct copy of Mr. Bond's e-mail and attachment are attached as Exhibit 20.

A/72751832.2

53. By letter dated October 20, 2008 (the "October 20 Letter"), Ms. Polizio for State Street sent to Mr. Bond for LCPI a letter noting that Mr. Bond had attached to his October 16 e-mail "a list of assets that Lehman Commercial Paper, Inc., confirms are mortgage loan assets that are rightfully owned by State Street Bank and Trust Company pursuant to the Master Repurchase Agreement". In this October 20 Letter, State Street also asked LCPI to identify the servicers for the three Purchased Assets not being serviced by TriMont: WH6124 (Grand Central Station); WH8035 (Project Easy Living FNMA VIII); and WH8033 (Project Easy Living FNMA VIII). A true and correct copy of Ms. Polizio's letter is attached as Exhibit 21.

54. Neither Mr. Bond nor any representative of LCPI (1) responded to or disputed in any way Ms. Polizio's October 20 Letter or (2) informed State Street of the identity of the servicer(s) of the three Purchased Asset loans listed in that letter.

55. In the October 10 Call, LCPI requested that State Street prepare a list of documents and other information still in LCPI's possession and constituting part of the Purchased Assets owned by State Street. By e-mail dated October 17, 2008, Ms. Yang of State Street sent to Mr. Fitts a list of the documents and information in question, requesting prompt access thereto (the October 17 Asset Files Request," a true and correct copy of which is attached as Exhibit 22).

56. LCPI never responded to State Street's October 17 Asset Files Request and State Street continued to be unable to get access to the asset files held by LCPI and by LCPI's servicers (both TriMont and the other servicers whose identity LCPI refused to disclose).

57. Backing away from its statement in the October 10 Call, LCPI then claimed entitlement to the Income from the Purchased Assets for the period from September 17 through 25, 2008, and claimed ownership of the 340 Madison Loan.

58.     At all times after June 12, 2008, a commercial loan identified in the September 29 Spreadsheet as "WH4373 Project Deuce Crossed Mezz A1" ("Project Deuce Loan") was a Purchased Asset in State Street's Pool.  The September 16, 2008 Detail Report lists the Market Value of Project Deuce as $61,250,000.  On information and belief, LCPI has directed TriMont not to remit to State Street more than $12 million in Income received on the Project Deuce Loan after September 16, 2008.

59.     Although LCPI's agent stated in the October 10 Call that State Street owned the Purchased Assets, Mr. Bond's October 16 e-mail suggested that LCPI had changed its view to assert that the Purchased Assets were "collateral."

60.     LCPI continued to act in other respects to frustrate State Street's ownership rights. For example, LCPI denied State Street's right to certain significant Income (including $12 million from the Project Deuce Loan), withheld documents and information constituting and concerning the Purchased Assets, which asset files were a component of the owned Purchased Assets, blocked State Street from access to TriMont's servicing records for the 34 Purchased Assets that TriMont serviced, and continued to fail to disclose the identity of the servicers for the other three Purchased Assets.  LCPI also withheld from State Street the 340 Madison Loan (and Income from that loan, if any came due under that loan after September 17, 2008), that LCPI had converted from State Street's Pool on September 16, when LCPI was already in default and knew the Pool was worth far less than what LCPI had represented and that was required by the MRA.

61.     In an effort to resolve the problems caused by LCPI's inconsistent actions that denied State Street's ownership rights under the MRA, including the confusion it has caused in the marketplace, and in an effort to obviate the need to file an adversary proceeding in this Court for redress, State Street on October 30, 2008, sent LCPI a letter requesting a stipulation concerning

State Street's ownership of the Purchased Assets. In this letter (the "October 30 Letter"), State Street sought agreement to a stipulation that (1) confirmed State Street's ownership of the Purchased Assets; (2) resolved the dispute as to State Street's right to Income under the Purchased Assets dating from State Street's September 17 Default Notice Letter to LCPI; (3) identified the servicer(s) for the Purchased Assets that LCPI continued to conceal; and (4) confirmed State Street's right of access to the asset files. A true and correct copy of the October 30 Letter without attachments is attached as Exhibit 23.

62.     LCPI's response to the October 30 Letter reflected LCPI's continuing efforts to sow confusion and uncertainty regarding State Street's ownership of the Purchased Assets.

63.     LCPI responded to the October 30 letter in a letter dated November 3, 2008, in which LCPI refused to agree to the stipulation and backed off its October 10 acknowledgement of States Street's ownership of the Purchased Assets, referring to the prior confirming letters and e-mails from State Street and its counsel as "containing self serving statements setting forth State Street's views with respect to various issues." In its November 3 letter, LCPI further equivocated about State Street's ownership rights, stating on the one hand that "Lehman does not dispute State Street's ownership of the applicable loans" but on the other hand that LCPI "will advise you by separate correspondence as to whether there is any disagreement with respect to the list" of Purchased Assets. A true and correct copy of the November 3 letter is attached as Exhibit 24.

64.     LCPI failed ever to provide to State Street that promised "separate correspondence" despite State Street's request about it in a letter dated November 5, 2008 (a true and correct copy of which is attached as Exhibit 25).

65.     LCPI also claimed it would provide in the "separate correspondence" the identities of the servicers that it had failed to identify.  LCPI has not provided State Street with that information, by "separate correspondence" or otherwise.

66.     In its November 3 letter, LCPI stated that it would "consider responding to specific requests for information or documents" despite the fact that it had failed to respond in any manner to State Street's detailed October 17 Asset Files Request.

67.     Recently, and despite LCPI's improper efforts, State Street has been able to obtain TriMont's cooperation regarding access to documents and information in the asset files serviced by TriMont, with the exception of the 340 Madison Loan.  State Street still has not obtained access to the asset files for the Grand Central and two Project Easy Living loans as to which LCPI still has failed to identify or confirm the servicer.

**D.     There is Confusion In The Marketplace As to Ownership
        of the 37 Purchased Asset Loans**

68.     LCPI's actions and omissions in the marketplace have been inconsistent with its October 10 acknowledgement of State Street's ownership rights, an acknowledgement that LCPI retreated from in its October 16 e-mail and then backed away from and equivocated about in its November 3 letter.  LCPI's actions have caused substantial confusion in the marketplace as to State Street's ownership of the Purchased Assets and have frustrated State Street's efforts to preserve the value of those Purchased Assets and exercise other rights of ownership, including its rights to sell them under the MRA.   As a result, State Street is suffering substantial and irreparable harm.

69.     State Street's efforts to preserve the value of, administer, and/or attempt to sell the Purchased Assets have included discussions and negotiations with various borrowers under those

loans.  State Street will need to deal directly with all or most of the borrowers to address, negotiate, and resolve issues as to those loans as they arise.

70.     Borrowers with whom State Street is already in contact have demanded from State Street evidence that State Street owns the Purchased Assets before they will remit payments to State Street or engage in negotiations or finalize agreements with State Street regarding their commercial loans.  For example, State Street owns the ProLogis Purchased Asset loan (#WH6266), which has an outstanding balance of more than $165,000,000.  That loan came due on November 11, 2008, on which date ProLogis was required to pay to State Street the principal balance as well as an interest payment of more than $692,000.  In the context of discussing a potential extension and restructuring of this loan with State Street, ProLogis informed State Street that it would not make any principal or interest payments directly to State Street because ProLogis is unsure whether State Street owns the loan.  State Street believes that Lehman has a substantial equity position in the ProLogis borrower that might be at risk if State Street pursues a course of action consistent with its rights as owner of the loan.  State Street has not received from LCPI any writing sufficient to provide the assurances ProLogis has requested.  ProLogis stated that a court order that State Street owns the loan would provide satisfactory evidence of ownership for ProLogis to pay the amounts due directly to State Street.  There is an urgent need for resolution of this matter to enable State Street to obtain the ProLogis Income to which it is entitled and to enable State Street to engage in negotiations and finalize documents to restructure the ProLogis loan and enforce and preserve its rights and remedies under the loan.  There is an urgent need for resolution of this matter so to enable State Street to obtain the ProLogis Income to which it is entitled and to enable State Street to engage in negotiations and finalize documents to restructure the ProLogis loan and enforce and preserve its rights and remedies under the loan.

71.     Further evidence of confusion in the market is demonstrated by a public statement made by ProLogis CEO Jeffrey Schwarz on October 23, 2008, in which he stated in the company's third quarter earnings conference call that ProLogis had an outstanding loan for $166,000,000 with Lehman Brothers, which was a reference to the Purchased Asset owned by State Street.  Mr. Schwarz then stated that ProLogis had spoken with a Lehman representative on October 22 "wherein [the Lehman representative] indicated they're intending to sit down with us shortly to discuss an extension of the existing loan . . . ."  A true and accurate copy of the relevant excerpt (p.5) from the Thomson Preliminary Transcript of the ProLogis earnings conference call is attached as Exhibit 26.

72.     State Street also has attempted to carry out negotiations with another borrower under a commercial loan in State Street's Pool.  That borrower has also expressed uncertainty as to whether it may deal with State Street.  In order to protect the value of that property, its identity is not disclosed in this public filing.

73.     Further, a lender that holds loan participation positions that are senior to State Street's Purchased Assets with respect to three distressed projects has demanded documents proving State Street's ownership of those Purchased Assets before sharing information with State Street in respect of such troubled projects or engaging in any further discussions concerning possible enforcement of remedies, debt restructuring alternatives or workout strategies.

74.     Confusion among specific borrowers and in the marketplace generally concerning ownership of the Purchased Assets is interfering substantially with State Street's ability to manage, preserve, realize on and/or sell the Purchased Assets, including by delaying and impeding State Street's ability timely to address the underlying issues that are causing the Purchased Assets to be in distress.

75.     After the Default Notice Letter on September 17, 2008, LCPI asked State Street to agree to hire LCPI and pay it a fee to manage State Street's portfolio of Purchased Assets and to give LCPI rights of first refusal to purchase certain of the Purchased Assets.  LCPI has conditioned its cooperation with State Street as to State Street's ownership rights -- including access to asset files -- on State Street's agreement to hire LCPI and give LCPI rights of first refusal to buy certain of the Purchased Assets.

E.     **Many of the 37 Purchased Asset Loans Are In Distress**

76.     Many of the commercial loans purchased by State Street that are in the Pool are in distress.

77.     State Street has been working expeditiously in an effort to value, evaluate, and make decisions as to the retention or disposition of its Purchased Assets.  In connection with those efforts, State Street has retained and been working with representatives of Jones Lang LaSalle, a commercial real estate firm.  State Street's efforts have included reviews of information and documents to which it has been able to gain access as well as communications with the borrowers on the Purchased Asset loans.

78.     The information that State Street has been able to review through its efforts to date has revealed that many of the borrowers under the Purchased Asset loans are in actual or imminent distress:  one has been declared in default; another one is in imminent risk of default; several have asked for extensions of or waivers of loan terms to avoid a declaration of default; one has abandoned further construction on the underlying project and several other projects are at risk of abandonment or cessation of work.  As many as ten of the Purchased Assets are in need of potential workout/restructuring discussions.

79.     A borrower on one of the other commercial loans in State Street's Pool of Purchased Assets recently informed State Street that several of the projects that it entered with Lehman were "at a substantial risk with the present bankruptcy" of Lehman and that the timing in finding a solution was extremely important in order to maintain the project's value and "credibility within the market." This borrower also noted that the contractor on the project was "threatening liens and lawsuits if they are not paid" and that the result of such "action would be catastrophic for the project and its future value . . ."

80.     The commercial real estate and financial markets are in turmoil generally. Borrowers' access to refinancing sources has been severely constricted. Market uncertainties and the global credit crunch compound the risk to State Street through borrower uncertainty as to ownership rights. In this difficult economic and financial market, State Street seeks to take prompt action with regard to the 37 commercial loans that comprise its Purchased Assets in order to preserve and maximize their value.

### F.     LCPI's Conversion of State Street Income

81.     Pursuant to section 11(b)(ii) of the MRA, <u>immediately</u> upon State Street's exercise of its right to declare LCPI in default on September 17, 2008 all Income received thereafter under any Purchased Asset in the Pool belonged to State Street.

82.     LCPI does not dispute that it received the Default Notice Letter from State Street on September 17, 2008.

83.     Although LCPI has authorized TriMont to remit to State Street Income received under the Pool on or after September 26, 2008, LCPI has refused to instruct or authorize TriMont to remit to State Street any Income received under the Pool between September 17 and 25, 2008.

Neither LCPI nor TriMont has remitted to State Street <u>any</u> Income received between September 17 and 25, 2008.

84.    On information and belief, LCPI has retained, or has caused TriMont to retain, more than $12 million in Income that TriMont received as servicer of the Project Deuce Loan between September 17 and 25, 2008.

85.    One of State Street's Purchased Assets is the Grand Central Station loan, which bears the identifying number WH6124.  Under that loan, the borrower is required to make monthly interest payments on the first of each month in the amount of approximately $195,885.  These monthly payments constitutes Income under the MRA.  LCPI knows the identity of the servicer of the Grand Central Station loan.  Despite State Street's requests for the identity of the servicer of this loan, LCPI has failed to identify to State Street the servicer of the Grand Central Station loan. LCPI has failed to remit (or direct the servicer to remit) to State Street any Income received under that loan.  The original lender entitled to receipt of the monthly interest payments under the was a Lehman entity, namely, Lehman Brothers Holdings, Inc.  On information and belief, LCPI or a related LCPI entity is the servicer for the Grand Central Station loan.

86.    Pursuant to sections 11(a) and 11(b) of the MRA, LCPI has no legal or equitable interest in, or right to, the Project Deuce Income, the Grand Central Station Income, or Income received from any other Purchased Asset in State Street's Pool after September 17, 2008.  LCPI's actions in failing to remit, or in failing to instruct third parties to remit, to State Street all Income under Project Deuce is unlawful, without legal or equitable right, and constitutes conversion of State Street's property.

87.    On information and belief, LCPI and other servicers for the Purchased Asset loans have custody or control over other Income received after September 17, 2008 from Purchased

Assets in State Street's Pool of which State Street is currently unaware. LCPI's direct or indirect retention of such Income is unlawful, without legal or equitable right, and constitutes conversion of State Street's property.

###### G.    LCPI's Conversion of the 340 Madison Loan

88.    At all times relevant to this complaint, Tom Luglio and Bill Lista were Managing Directors at Lehman Brothers, Inc. and Rick Flynn worked for Lehman Brothers, Inc., in its Fixed Income Sales Department. All three had responsibilities regarding Purchased Assets under the MRA and had communications with State Street representatives concerning the Purchased Assets.

89.    At all times relevant to this complaint, Steven R. Meier and Sean Dillon were employed by State Street, Meier as an Executive Vice President and Global Cash Chief Investment Officer and Dillon as Vice President and Portfolio Manager. In September 2008, Meier and Dillon communicated with Luglio, Lista, and Flynn concerning Purchased Assets under the MRA.

90.    Pursuant to the MRA, LCPI was required to maintain in State Street's Pool of Purchased Assets commercial loans that had a "Market Value" at or above the sum of the $1 billion Repurchase Price and the "Buyer's Margin Percentage," as each term was defined in the MRA. If the Market Value fell below that sum, a "Margin Deficit" would result and State Street could, under section 4(a), require LCPI to add cash or additional Purchased Assets to increase the value to the required amount.

91.    Throughout the course of their dealings under the MRA, LCPI provided State Street with information regarding the Market Value of the Purchased Assets in State Street's Pool via the four daily Detail Reports from the Bank discussed previously.

92.    Together, the four Detail Reports for any given day identified the specific commercial loans in State Street's Pool and their current Market Value as provided by LCPI.

A/72751832.2

93.     Under the MRA, LCPI could substitute or remove the Purchased Assets designated to State Street's Pool, provided that LCPI maintained in that Pool Purchased Assets that had an aggregate Market Value sufficient to cover State Street's original $1 billion purchase price (the "Investment Amount") plus an additional "Required Amount" for the Buyer's Margin Percentage above the $1 billion.  Under the contract documents, the original Buyer's Margin Percentage was 5%, which required LCPI to ensure that the Required Amount in the Detail Reports met or exceeded $1.05 billion.   The Detail Reports contain figures called "Excess Amount," which was the amount by which the Market Value of the commercial loans in the Pool, as valued by LCPI, exceeded the Required Amount.

94.     In early September 2008, State Street became concerned about the Purchased Assets in the Pool and requested that LCPI provide State Street with additional information regarding those commercial loans beyond what was provided in the Detail Reports.

95.     Based on its concerns, State Street and LCPI agreed to increase the Buyer's Margin Percentage from 5% to 10%, which required that LCPI ensure that the State Street's Pool held commercial loans with an actual Market Value totaling at least $1.1 billion.

96.     LCPI agreed to that margin request increase, as confirmed in an e-mail and spreadsheet that Flynn sent to Meier, Dillon, and several others at State Street on September 10, 2008 in which Flynn also noted the addition to the Pool of another mortgage loan to meet the higher 10% margin.  A true and correct copy of that e-mail and spreadsheet are attached at Exhibit 5 (the "September 10 Communication").  On September 11, LCPI added one other mortgage loan to the Pool.

97. The spreadsheet in the September 10 Communication revealed that LCPI had marked down the values of the Purchased Assets to a figure below the Market Values that LCPI had been representing through the Detail Reports.

98. Between September 10 and 16, 2008 State Street continued to be concerned about the quality of Purchased Assets in the Pool and communicated its concerns to LCPI, requesting that LCPI obtain better and additional assets for the Pool.

99. On September 15 and 16, 2008, LCPI represented to State Street that LCPI was seeking to obtain better quality and additional loans for the Pool.

100. In a telephone call on September 15, 2008 Lista told Meier that he was working to find better and more collateral for State Street's MRA Pool.

101. In one telephone call on September 16, 2008 between Meier, Lista and Flynn, Meier made a margin call to LCPI seeking from LCPI additional Purchased Assets under the MRA and specifically requesting that LCPI increase the Purchased Assets to 25% above the $1 billion Investment Amount. Flynn responded to that request, stating, "Yeah. Alright. That is what I will work on next."

102. In a second telephone call on September 16, 2008 Meier again asked Luglio for more Purchased Assets under the MRA. Describing the Purchased Assets in State Street's Pool, Luglio said: "There is clearly some stuff in there that is one cent, nine cents, 16 cents [*i.e.*, on the dollar]" and that "It does not fit the bill, under any circumstances." Meier asked Luglio to give State Street "a higher level of collateralization and even swap out some of the dicier stuff ...."

103. The Detail Reports State Street received on September 15 and 16, 2008 (Exhibits 6 & 7), did not have any Purchased Assets that had been marked down to 1 cent, 9 cents, or 16 cents on the dollar. To the contrary, the Market Value that LCPI used for each commercial loan listed

on the September 15 and 16 Detail Reports was at the full amount -- 100% -- of its outstanding principal balance, with no mark down at all.

104.    The spreadsheet attached to Mr. Flynn's September 10 Communication (<u>Exhibit 5</u>) had one Purchased Asset marked down to 15% but <u>none</u> that had been marked down to 1% or 9%. Instead, LCPI represented in the September 10 Spreadsheet that the Market Values for the vast majority of the Purchased Assets in State Street's Pool were well above 90%, with some even higher than 100%, of the outstanding principal amounts owed on those loans.

105.    Luglio's statements that "There is clearly some stuff in there that is one cent, nine cents, 16 cents [*i.e.*, on the dollar]" and that "It does not fit the bill, under any circumstances" admitted that the Purchased Assets that LCPI had designated to State Street's Pool were insufficient under the MRA and that LCPI had vastly overstated the asset values in both the Detail Reports and September 10 spreadsheet.

106.    In a third telephone call on September 16, 2008 Meier asked Flynn whether Lista had been able to locate additional Purchased Assets to include in the State Street's Pool, to which Flynn responded that Lista "is working on it." Meier then made a margin call to Flynn, stating "we need to make a margin call with it, requesting higher margin on the trade."

107.    In a fourth telephone call on September 16, 2008 Flynn told Meier that he had just gotten off the phone with Luglio and that Luglio "has been working and continues to work on the issue" of getting State Street more Purchased Assets under the MRA.

108.    Under section 4(a) of the MRA, LCPI was required to add more cash or commercial loans to State Street's Pool when LCPI was aware, as here, that the Purchased Assets in that Pool were below the required margin amount. All the conversations related in the paragraphs of the complaint above made clear that LCPI was aware that the margin amount in State Street's account

was inadequate under the MRA.  In those conversations, State Street asked for additional margin, and LCPI's representatives committed to obtain it, through September 15 and 16.  In these circumstances, LCPI could not <u>remove</u> any Purchased Asset at all, let alone remove a Purchased Asset without replacing it with one of equal or greater value.  But that is exactly what LCPI did.

109.    Then, in a telephone call on September 17, 2008, Flynn told Meier that State Street might want to consider liquidating assets, referring to Purchased Assets in State Street's Pool.

110.    In another telephone call on September 17, 2008 Lista told Meier that the Lehman "firm is in the process of … moving into a bankruptcy situation."  In that conversation, Meier told Lista that he had sought more collateral for the Pool from LCPI on September 16, to which Lista responded,

> "…the reason why we couldn't do it yesterday is because the announcement took place at 2:30.  … And when we were trying to do that, at, you know, 2:00 o'clock, basically we couldn't get any more assets shifted from, from entity to entity, which is what we would've had to do."

111.    Despite LCPI's representation that it was trying to <u>add</u> assets to State Street's Pool on September 16, and that it was prevented from shifting assets from entity to entity, LCPI in fact <u>removed</u> a $31 million Purchased Asset from State Street's Pool.  Thus, despite the fact that LCPI acknowledged State Street's request for additional margin, LCPI added no more assets to the Pool between September 12 and 16 and, instead, removed one.

112.    The 340 Madison Loan was a Purchased Asset in State Street's Pool on every day from June 16 through September 15, 2008.  The last time it appeared in State Street's Pool, however, was in a September 15, 2008 Detail Report, in which it was reported as having a Market Value of over $31 million.  A true an correct copy of the September 15 Detail Report is attached as <u>Exhibit 6</u>.

113. LCPI purported to remove 340 Madison Loan from State Street's Pool on September 16, 2008.

114. With the exception of 340 Madison, State Street's Pool of commercial loans remained the same between September 12 and 16, 2008 with no additions, substitutions, or removals. The only activity that occurred in that Pool was LCPI's purported removal of the 340 Madison Loan on September 16, 2008.

115. LCPI purported to remove the 340 Madison Loan from the Pool despite the fact that it had been in the State Street Pool for three months, despite the fact that LCPI representatives Luglio, Lista, and Flynn had been representing to State Street that they were seeking to improve the quality of the Purchased Assets in the Pool and obtain additional Purchased Assets for the Pool, and despite the fact that Luglio had admitted that LCPI had overstated the value of Purchased Assets in the Pool.

116. Pursuant to section 4(b) of the MRA, if the Pool contained a "Margin Excess" in LCPI's favor (as Margin Excess is defined in section 4(b)), then LCPI could, by notice to State Street, require State Street to transfer cash or Purchased Assets to LCPI. At no point on September 15 or 16, 2008 did LCPI provide any notice to State Street of any Margin Excess in the Pool.

117. LCPI gave no notice of a Margin Excess before removing the 340 Madison Loan because the Pool contained no Margin Excess before it was removed on September 16.

118. At no time on or after September 10, 2008 did LCPI have, and on information and belief, at no time did it believe itself to have, color of any legal or equitable right to remove any Purchased Asset from the Pool. To the contrary, LCPI had represented to State Street that LCPI was working to add Purchased Assets to and improve the quality of the Purchased Assets in State Street's Pool.

119.    LCPI knew that the "valuations" of the Purchased Assets reflected in the September 10 spreadsheet and in the Detail Reports during the period between September 11 and 16, 2008 were grossly overstated and therefore that LCPI had not provided adequate assets in State Street's Pool.

120.    LCPI's failures both to add assets to the Purchased Assets and to value the Purchased Assets accurately in the period between September 11 and 16, 2008 were knowing breaches of the MRA by LCPI, made without color of legal right.

121.    Acting without color of legal right, LCPI unlawfully purported to remove the 340 Madison Loan from the pool of Purchased Assets on September 16, 2008.

122.    Pursuant to section 4(a) of the MRA, section 9 of the Confirmation Letter, and Exhibit A to the Custody Agreement, and the margin calls from State Street, LCPI was obligated to include in the Pool Purchased Assets having an actual Market Value not less than $1.25 billion, consisting of the $1 billion Buyer's Margin Amount and the additional 25% for the Buyer's Margin Percentage.

123.    Pursuant to sections 4(a) and 9(a) of the MRA and section 11 of Annex I to the MRA, LCPI could not remove or substitute Purchased Assets from State Street's account if doing so would result in a Margin Deficit as that term is defined in section 4(a).

124.    At the time LCPI purported to remove the 340 Madison Loan from the Pool, the actual Market Value of that Pool was already below not only the $1.25 billion amount, but even the $1.1 billion amount required when the Buyer's Margin Percentage was increased to 10% on September 10.  The Market Value of State Street's Pool was below these amounts due to LCPI's false and overstated valuations.  The purported removal of the 340 Madison Loan caused the Market Value of the Pool to fall even farther below the amounts required under the MRA.

A/72751832.2

125.     LCPI understood when it purported to remove the 340 Madison Loan that the aggregate Market Value of the Purchased Assets under the MRA was inadequate to meet LCPI's obligations under the MRA and Custody Agreement, and accordingly that its counterparty, State Street, would depend upon unfettered access to the assets it owned in order to mitigate its damage.

126.     Simultaneously with its entry into the MRA, State Street had obtained the guarantee of Lehman Brothers Holdings, Inc. ("LBHI"), the indirect parent of LCPI, to guarantee LCPI's obligations under the Custody Agreement.  On September 15, 2008 LBHI filed a chapter 11 petition for bankruptcy.

127.     At the time LCPI purported to remove the 340 Madison Loan from the Purchased Assets, LCPI was a subsidiary of Lehman Brothers, Inc. ("LBI").  On information and belief, representatives of LCPI knew or had reason to know that LBI had commenced or would soon commence a proceeding under the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa et seq.

128.     LCPI purported to remove the 340 Madison Loan from the Purchased Assets in a bad-faith effort, undertaken without color of legal or other right, to seize and hold assets in which it had no legal or equitable interest.

129.     LCPI filed a petition under chapter 11 of the Bankruptcy Code in this Court on October 5, 2008.  LCPI's bankruptcy filing was an "Act of Insolvency" and an additional automatic Event of Default under the MRA.

130.     The debtor-in-possession has no legal or equitable interest in the 340 Madison Loan.  State Street is the rightful owner of the 340 Madison Loan.

131.     State Street has suffered, and continues to suffer, great harm as a direct result of LCPI's failure to acknowledge, and LCPI's interference with, State Street's ownership rights in the

Purchased Assets. Such harm includes, but is not limited to, State Street's inability to take possession of all the Purchased Assets identified in the September 29 Spreadsheet on or after September 17, 2008, including access to all servicers and asset files relating to the Purchased Assets so as to enable State Street to negotiate for or transfer the servicing of those Purchased Assets, collect Income, and properly evaluate, value, protect, manage, administer, preserve, sell, and enforce its rights and remedies with respect to the Purchased Assets.

## FIRST CAUSE OF ACTION

### Declaratory Judgment -- Ownership of Purchased Assets

132. State Street here incorporates as though alleged in full each of sections 1 through 131 as if fully set forth herein.

133. A substantial and actual controversy exists between State Street and LCPI as to State Street's ownership of the Purchased Assets listed in the September 16 Detail Reports and the 340 Madison Loan.

134. A declaration of the rights and legal relations of the parties with respect to the Purchased Assets is urgently needed. Specifically, declaratory relief is needed to confirm that, pursuant to the MRA, State Street owns, in fee simple absolute, all rights of the lender in connection with each of the following Purchased Assets, including as to asset files, and access to the servicers and their files, and that, with respect to each such loan, all rights of repurchase, and any and all other rights or interests in the same of LCPI have been cut off:

|    | MTS ID | Loan # | Description | Lien |
|----|--------|--------|-------------|------|
| 1. | VU22 | VU22 | HERITAGE FIELDS | 1st |
| 2. | WH5989 | WH5989 | OTAY RANCH_SAN DIEGO_SR | 1st |
| 3. | WH1331 | WH1331 | WYNDHAM BERMUDA | 1st |
| 4. | WH2811 | WH2811 | SAN CRISTOBAL CABO SAN LUCAS | 1st |
| 5. | WH6019 | WH6019 | 1440 STORY AVE ACQUISITION | 1st |

|     | MTS ID | Loan # | Description | Lien |
|-----|--------|--------|-------------|------|
| 6.  | WH2249 | WH2249 | STORAGE DELUXE BX RIVER AVE BUILDING LOAN | 1st |
| 7.  | WH6184 | WH6184 | SPRINGFIELD ASSEMBLAGE SENIOR | 1st |
| 8.  | WH6086 | 100101621 | STORAGE DELUXE - JAMAICA AVE BUILDING | 1st |
| 9.  | VT71 | VT71 | STORAGE DELUXE (CROMWELL) ACQU | 1st |
| 10. | WH6087 | 100101622 | STORAGE DELUXE - JAMAICA AVE ACQUISITION | 1st |
| 11. | VX04 | VX04 | STORAGE DELUXE (481 GRAND)-BUI | 1st |
| 12. | WH2251 | WH2251 | STORAGE DELUXE BX RIVER AVE PROJECT LOAN | 1st |
| 13. | WH8966 | 100102042 | 1150 18TH STREET B NOTE | 2nd |
| 14. | SU02 | SU02 | BREAKERS AT EDGEWATER | 2nd |
| 15. | WH8946 | 100102038 | 1133 WESTCHESTER BUILDING B NO | 2nd |
| 16. | WH5856 | 100101521 | 237 PARK BRIDGE MEZZ 1 | Mezz. |
| 17. | WH6266 | 100101704 | PROLOGIS | Mezz. |
| 18. | TV71 | TV71 | CARILLON | Mezz. |
| 19. | WH4373 | 100101189 | PROJECT DEUCE CROSSED MEZZ A1 | Mezz. |
| 20. | WH9018 | 100102055 | PROJECT DEUCE CROSSED MEZZ A2 | Mezz. |
| 21. | WH6124 | 100101635 | GRAND CENTRAL STATION | Mezz. |
| 22. | WH5469 | 100101382 | BRADFORD SUITES MEZZ | Mezz. |
| 23. | WC16 | WC16 | 254 PARK AVE-MEZZ | Mezz. |
| 24. | WE325 | WE325 | 200 11TH AVE MEZZ | Mezz. |
| 25. | WH4981 | 100101313 | 1310 N COURTHOUSE MEZZ | Mezz. |
| 26. | WE44 | WE44 | 88 GREENWICH MEZZ 4 | Mezz. |
| 27. | WH3501 | WH3501 | PROJECT PEACH CREDIT | Mezz. |
| 28. | WH1729 | WH1729 | MANDALAY MEZZ | Mezz. |
| 29. | VC16 | VC16 | 757 3RD AVE MEZZ | Mezz. |
| 30. | WH3343 | WH3343 | 1140 AVENUE OF AMERICAS MEZZ | Mezz. |
| 31. | WE117 | WE117 | ICON BRICKELL | Mezz. |
| 32. | WH8035 | 100101888 | PROJECT EASY LIVING FNMA VIII | Mezz. |
| 33. | WH3403 | WH3403 | HOLLINS FERRY MEZZ | Mezz. |
| 34. | VV58 | VV58 | 300 SOUTH WACKER MEZZ | Mezz. |
| 35. | WH3209 | WH3209 | SEAPORT CENTER MEZZ | Mezz. |
| 36. | WH8033 | 100101886 | PROJECT EASY LIVING FNMA VIII | Mezz. |
| 37. | WH3861 | 100101073 | 340 MADISON AVE. MEZZ | Mezz. |

135.     Declaratory relief also is needed to confirm that LCPI held no color of right or title to any of the Purchased Assets identified above when LCPI filed its voluntary petition for bankruptcy on October 5, 2008, and that, accordingly, all Purchased Assets identified in the paragraph above are not part of the debtor's estate under §541 of the Bankruptcy Code.

136.     Pursuant to 28 U.S.C. §2201 and Fed. R. Bankr. P. 7001, this Court should grant the declaratory relief requested above and grant such other and further relief as may be necessary to enforce State Street's ownership rights in those Purchased Assets.

## SECOND CAUSE OF ACTION

### Declaratory Judgment -- Income

137.     State Street here incorporates as though alleged in full each of sections 1 through 136 as if fully set forth herein.

138.     A substantial and actual controversy exists between State Street and LCPI as to State Street's ownership of Income generated from the Purchased Assets on or after September 17, 2008.

139.     A declaration of the rights and legal relations of the parties with respect to the Purchased Assets is urgently needed.  Specifically, declaratory relief is needed to confirm that, pursuant to the MRA, State Street owns:  all Income generated by any of the Purchased Assets identified in the First Cause of Action above after LCPI received State Street's Default Notice Letter on September 17, 2008 including, but not limited to, the $12 million in Income received under the Project Deuce Loan and any Income from the Grand Central Station Loan.  To the extent such Income has not been remitted to State Street it should be so remitted and held in escrow for State Street pending that remittance.

A/72751832.2

140.     Declaratory relief also is needed to confirm that LCPI held no color of right or title to any of the Income identified in the preceding paragraph when LCPI filed its voluntary petition for bankruptcy on October 5, 2008 and that, accordingly, all that Income is not part of the debtor's estate under §541 of the Bankruptcy Code.

141.     Pursuant to 28 U.S.C. §2201 and Fed. R. Bankr. P. 7001, this Court should declare that LCPI has no legal or equitable interest in the Income generated by any of the Purchased Assets identified in Count I above after LCPI received State Street's Default Notice Letter on September 17, 2008 and grant such other and further relief as may be necessary to enforce those rights and obligations.

## THIRD CAUSE OF ACTION

### Conversion

142.     State Street here incorporates as though alleged in full each of sections 1 through 141 as if fully set forth herein.

143.     Without color of legal right, LCPI as debtor-in-possession has wrongfully converted the Purchased Assets to its own benefit, including the Income from the Purchased Assets, the asset files, and the 340 Madison Loan.

144.     State Street is the rightful owner of the converted property.

145.     State Street has requested that LCPI turn the converted property over to State Street, and LCPI has refused to do so.

146.     LCPI has exercised and assumed an unauthorized right of ownership and control over this converted property and has interfered with State Street's ownership rights in it.

147.     State Street has suffered damages, including irreparable harm, through LCPI's acts of conversion.

A/72751832.2

## FOURTH CAUSE OF ACTION

### Injunctive Relief

148.    State Street here incorporates as though alleged in full each of sections 1 through 147 as if fully set forth herein.

149.    Without color of legal right, LCPI as debtor-in-possession has purported to exercise dominion over the property of State Street, including the Purchased Assets, Income from the Purchased Assets received on or after September 17, 2008 and the 340 Madison Loan.

150.    Its wrongful exercise of this dominion has caused and is causing irreparable harm that cannot be remedied by an action at law.

151.    A permanent injunction is necessary to enjoin LCPI as debtor-in-possession, and its affiliates and agents acting in concert with it, from interfering with State Street's rights in and access to the Purchased Assets (including the 340 Madison Loan) and the Income that it received under the Purchased Assets on or after LCPI received State Street's Notice of Default Letter on September 17, 2008 (including the $12 million in principal payments from Project Deuce and all Income under the Grand Central Station Loan), and ordering LCPI, as debtor-in-possession, to turn over all such property to State Street.

### PRAYER FOR RELIEF

WHEREFORE, State Street respectfully requests that this Court:

A.    Enter a declaratory judgment declaring the following:

1.    State Street owns each of the Purchased Assets identified in the table under the First Cause of Action above, which assets are not part of the debtor's estate under §541 of the Bankruptcy Code:

2. State Street owns all Income generated by any of the Purchased Assets identified in the preceding paragraph after LCPI received State Street's Default Notice Letter on September 17, 2008 including, but not limited to the $12 million in Income received under the Project Deuce Loan and any Income received on the Grand Central Loan. This property is not part of the debtor's estate under §541 of the Bankruptcy Code.

3. State Street owns the 340 Madison Loan and is entitled to all Income and asset files concerning that loan. The 340 Madison Loan is not part of the debtor's estate under §541 of the Bankruptcy Code.

B.      Enter a permanent and mandatory injunction against LCPI ordering that LCPI desist from interfering, directly or indirectly, with State Street's ownership, possession, and access to the Purchased Assets, including the identity of all servicers, access to all asset files, and receipt of all Income under the Purchased Assets that came due after September 17, 2008.

C.      Order LCPI to deliver to State Street an accounting of all Income it and its servicers have received under all of the Purchased Assets, directly or indirectly, on or after September 17, 2008, and that LCPI deliver to State Street all other property converted from State Street without color of legal right by the debtor or debtor-in-possession, including Income from the Project Deuce and Project Easy Living and Grand Central loans, all loan notes, the identity of all servicers of the Purchased Assets, and all asset files relating to those Purchased Assets and the 340 Madison Loan, and

A/72751832.2

D.      Grant State Street such other and further relief as may be just and proper.


DATED:  November 19, 2008

                                        **BINGHAM McCUTCHEN LLP**

                                        **By:**  _/s/ Evan J. Benanti_____
                                        Sabin Willett (*pro hac vice motion pending*)
                                        Andrew C. Phelan (*pro hac vice motion pending*)
                                        Evan J. Benanti (EB1202)
                                        Eric Heining (*pro hac vice motion pending*)
                                        One Federal Street
                                        Boston, MA 02110
                                        Tel:  617-951-8000
                                        Fax:  617-951-8736

                                        *Counsel to State Street Bank and Trust Company*